UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2008-165 (WOB)

JERITTA HAYES                                              PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

KEVIN DYE, ET AL.                                         DEFENDANTS

On August 23, 2010, this matter came before the court for oral argument on motion for summary judgment by Defendants, Charles Biel, Bryan Bogard and Amanda Donelan (Doc. #62), Defendant Amber Conrad's motion for summary judgment (Doc. #66), Plaintiff's motion to strike Defendant Conrad's motion for summary judgment (Doc. #67), Defendant Conrad's motion for additional time to file dispositive motion (Doc. #68), Plaintiff's motion to strike the reply memorandum of Defendants, Biel, Bogard and Donelan (Doc. #74), and Plaintiff's motion for reconsideration of Opinion and Order (Doc. #77). Stephen Felson and Lisa Meeks represented the Plaintiff. Alice Keys and Michael Bartlett represented Defendants Biel, Bogard and Donelan. Thomas Sweeney represented Defendant Conrad. Jennifer Langen represented movant and prospective Defendant Kenneth Stevens. Official court reporter Joan Averdick recorded the proceedings.

## *Introduction*

This is a 42 U.S.C. § 1983 case where Plaintiff, Jeritta Hayes, alleges violations of her First, Fourth and Fourteenth Amendment rights by multiple police officers (Charles Biel, Bryan Bogard, Kenneth Stevens, Kevin Dye, Amber Conrad, and Amanda Donelan) from several different law enforcement agencies (Covington Police, DEA, Highland Heights-Southgate Police).

The alleged constitutional violations arose from an incident where Plaintiff, while driving her car, was stopped by Covington police at the request of the DEA. During the course of the stop, Plaintiff was patted down multiple times by Covington Police officers and the interior of her car was searched by hand by a Covington Police officer. Plaintiff's car was also searched using a police dog from Highland Heights. Plaintiff was also patted down a third time by a Highland Heights police officer. These searches turned up nothing and Plaintiff was subsequently released from the scene.

Plaintiff later attempted to lodge a complaint with the Covington Police, the law enforcement agency that stopped her. In the course of trying to do so, she spoke with a senior police official over the phone and later met with that police officer in person. As a result of that meeting, Plaintiff was escorted out of the Covington police station and was told not to contact the Covington Police Department again regarding the stop and search

lest she be arrested for harassment. Plaintiff now brings this action before the court.

Due to the factual complexities involved in the case, the court's analysis of the conduct in question is set out on an individual basis for each Defendant. All reasonable inferences have been made, and all the evidence has been viewed, in the light most favorable to Plaintiff as the non-moving party. Where the Defendants have presented an alternate set of facts, they are set out separately below.

The court's analysis concludes the following:

1) That the stop of Plaintiff's vehicle was not a constitutional violation as it was supported by reasonable suspicion;

2) That actions taken by the police during the automobile stop were supported by reasonable suspicion, but not probable cause. Therefore, some of these actions were constitutionally permissible and some were potentially not. As a result, some of the police officers involved are entitled to qualified immunity while others are not.

3) That the first two pat-downs of Plaintiff conducted by police officers, Charles Biel and Bryan Bogard, were impermissible, subject to the issue of consent. Plaintiff's consent is an issue of material fact preventing the granting of summary judgment in this case for those specific acts on the

basis of qualified immunity;

4) That DEA Task Force Agent Kevin Dye has been dismissed
from the case with prejudice;

5) That Plaintiff's motion for reconsideration of the
court's earlier denial of her attempt to amend her complaint to
add DEA Task Force Agent Kenneth Stevens as a Defendant is denied
and that Stevens will not now be added as a party to this
litigation;

6) That Captain Amanda Donelan is entitled to qualified
immunity on the First Amendment claim against her.

### *FACTUAL BACKGROUND*

On December 6, 2007, DEA Task Force Agents, Kenneth Stevens
and Kevin Dye, were conducting covert surveillance of a house in
downtown Covington which was a suspected center for illegal drug
transactions.[1]

Plaintiff parked her car out front of the house and ran
inside for a moment, and then quickly returned to her car. (Doc.

---

[1] The court notes that Kenneth Stevens and Kevin Dye were
actually local police officers from Erlanger and the Cincinnati-
Northern Kentucky Airport, respectively. Stevens and Dye were on
loan to the Cincinnati DEA Task Force and were deputized as
federal agents at the time of these events. However, at oral
argument, Plaintiff agreed that she is not trying to sue the
United States nor the City of Erlanger, but rather just Dye and
Stevens in their individual capacities. All parties agreed that
principles pertaining to 42 U.S.C. § 1983 actions should be
applied.

#84 at p. 17-19).  After this brief stop, Plaintiff drove down Russell Street and made her way towards Newport over the Twelfth Street Bridge.  It so happened the house under surveillance belonged to Plaintiff's mother.  Plaintiff ran inside the house to pick up some money her mother was lending her.

As Plaintiff departed her mother's house, she did not have any contact with anyone.  (Id. at p. 19).  According to Plaintiff, at no time during her travel did she run a stop sign or a traffic light. (Id. at p. 28).

As Plaintiff was driving away from her mother's house, Agent Stevens began to follow her car.  Agent Dye called the Covington Police to request a marked vehicle in order to conduct a traffic stop.  While Agent Dye was placing the call, Agent Stevens observed what he believed to be a traffic violation committed by Plaintiff.  Agent Stevens radioed that report to Agent Dye who passed it along to Covington Police dispatch via cell phone.  Covington dispatch put out a description of the Plaintiff's vehicle over the radio, and Officer Charles Biel responded to the broadcast.

Plaintiff was driving her car across the Twelfth Street Bridge from Covington into Newport when she was pulled over by Officer Biel.  Officer Bryan Bogard, also of the Covington Police, arrived on the scene to back up Officer Biel.

After being pulled over, Plaintiff states that Officer Biel

asked for her consent to search her car. (Id. at p. 32).

Plaintiff was non-responsive; she did not say yes or no. (Id.).

Officer Biel then asked her to remove her coat and she complied.

(Id. at p. 33). After checking her coat, Officer Biel then asked

Plaintiff to exit the vehicle and stand over on the sidewalk.

(Id. at p. 33, 35). Again, she complied with the order. (Id. at

p. 35).

When she exited her car, Plaintiff was patted down by

Officer Biel. (Id.). According to Plaintiff, Officer Biel

pulled money out of her pocket. (Id.) Plaintiff was also made

to remove her boots which were then checked by Officer Biel.

(Id.).

Next, Officer Biel searched Plaintiff's vehicle. (Id. at p.

36). Plaintiff states that Officer Biel told her he was

searching for drugs. (Id.). When Officer Biel asked her about

searching her vehicle, Plaintiff was again non-responsive; she

said neither yes nor no. (Id. at p. 144). Plaintiff did not

think she had any say in whether her car was searched or not.

(Id. at p. 37). At no time did Plaintiff verbally state to

Officer Biel that he could not search her vehicle. (Id. at p.

145, 173). Plaintiff maintains the search of her vehicle by

Officer Biel occurred after she was patted down. (Id. at p.

145).

Shortly after Plaintiff was patted down by Officer Biel,

Officer Bogard arrived on the scene. When she went over to the sidewalk as directed by Officer Biel, Officer Bogard made contact with Plaintiff and proceeded to pat her down a second time. (Id. at p. 150). Plaintiff told Officer Bogard that she had already been patted down. (Id.). Plaintiff did not explicitly object to Officer Bogard's pat-down as she did not think she had a choice in the matter. (Id. at p. 150, 173). Instead, Plaintiff complained that she did not think that male police officers could pat-down female suspects. (Id. at p. 173). According to Plaintiff, Officer Bogard had her shake her bra. (Id. at p. 151). Plaintiff then waited on the sidewalk for approximately another twenty minutes until the canine unit arrived. (Id. at p. 155).

When the canine officer, Lieutenant Conrad, arrived, she spoke with Officer Biel for about ten minutes before taking the dog out of her police car. (Id. at p. 163). The canine was deployed and placed inside of Plaintiff's vehicle. (Id. at p. 164). According to Plaintiff, Lieutenant Conrad did not ask for her consent to search the vehicle. (Id. at P. 170). However, Plaintiff did not explicitly tell Lieutenant Conrad that she did not want her car searched. (Id.). Instead, Plaintiff stated she did not want "that stinking dog" in her car. (Id. at p. 171). Plaintiff does not recall whether she was patted down by Lieutenant Conrad. (Id. at p. 167-168).

Ultimately, these searches proved fruitless as no illegal drugs were found in Plaintiff's vehicle. Plaintiff was subsequently released from the scene without arrest, a citation or warning of any kind. Plaintiff maintains that she was stopped by the police for over an hour before she was released from the scene. (Id. at p. 167).

Plaintiff called the Covington Police Department to lodge a complaint concerning these events. She spoke to a couple of different police officers before her call was eventually returned by then Lieutenant Donelan.[2] (Id. at p. 194).

Plaintiff's phone call with Lieutenant Donelan lasted about five minutes. (Id. at p. 196). Plaintiff maintains that she was civil and did not raise her voice during this phone conversation. (Id.).

The phone call was followed up by an in-person meeting at the Covington Police Station. During that meeting, Plaintiff was told by Lieutenant Donelan that the Covington Police were doing a "good favor" for another law enforcement agency and that was all the information that Donelan had. (Id. at p. 45, 200). Lieutenant Donelan offered to take Plaintiff's name and number and pass it along to that other agency so they could contact her in regards to her grievance. Lieutenant Donelan then warned

---

[2] At the time of these events, Donelan was a Lieutenant and was the supervisor for the second shift of patrol which included Officer Biel.

Plaintiff that, if she called or came to the Covington Police Department again, she would be arrested for harassment. (Id. at p. 45, 200). Lieutenant Donelan then escorted Plaintiff out the door. (Id.). Plaintiff denies cursing or yelling at Lieutenant Donelan during their face-to-face encounter. (Id. at p. 204-207).

Plaintiff has since filed suit under 42 U.S.C. § 1983, alleging violations of the First, Fourth, and Fourteenth Amendments.[3]


### *AGENT KENNETH STEVENS*

Stevens is an officer with the Erlanger Police Department. (Doc. #63-6 at p. 5). On December 6, 2007, Stevens was assigned to the Cincinnati DEA Task Force. (Id.). Stevens was in plain clothes and in an unmarked vehicle. (Id. at 6-7). He was conducting surveillance on a suspected drug house in Covington at the time he first observed Plaintiff's vehicle. (Id.). During the course of his surveillance, Stevens observed another individual approach Plaintiff's vehicle and hand her something through the driver's side window. (Id. at p. 9, 16-17). Based on his experience, Stevens believed he had observed a hand-to-hand drug transaction. (Id. at p.9-10, 16-17). After Stevens

---

[3] Plaintiff's complaint does not name any official Defendants nor any government entities or municipalities. The police Defendants are named in their individual capacities only.

observed this suspicious activity, Plaintiff's vehicle drove off down Russell Street. (Id. at p. 10).

Stevens followed Plaintiff's vehicle while instructing Agent Dye to contact Covington Police dispatch to request a marked unit to make a stop. (Id. at p. 12). As he was following behind, Stevens observed Plaintiff's vehicle roll through a stop light at 12th and Russell Streets. (Id. at p. 13). Stevens called out his observations over the radio. (Id. at p. 13-14). Stevens continued to follow Plaintiff's vehicle. He then observed her fail to come to a complete halt at a stop sign at 12th and Garrard Streets. (Id. at p. 14-15). Again, Stevens called out his observations over the radio to Agent Dye. (Id. at p. 15).

### *AGENT KEVIN DYE*

On December 6, 2007, Dye was employed as an officer with the Cincinnati-Northern Kentucky Airport Police. (Doc. #63-3 at p. 5). He was also on loan to the Cincinnati DEA Task Force and was deputized as a federal agent. (Id. at p. 5-6). Dye, along with another DEA Task Force Agent, had been conducting surveillance of a house in downtown Covington when they first observed Plaintiff. (Id. at p. 7-9).

When Plaintiff's vehicle pulled away from the house that was under surveillance, she was followed by Agent Stevens while Dye was calling Covington Police dispatch on his cell phone to try

and get a marked unit to stop Plaintiff's car.  (Id. at 9).  Dye
was not able to observe any traffic violations committed by
Plaintiff.  (Id.).

Stevens, who had been following behind in his car, observed
Plaintiff run a stop sign at 12th and Garrard Streets and called
it out to Dye over the radio.  (Id.).  Dye then relayed that
report to Covington Police dispatch.  (Id.).


### OFFICER CHARLES BIEL

Officer Biel was on patrol for Covington Police on December 6,
2007, when he heard on the radio that DEA was following a vehicle
that was believed to have been involved in an illicit drug
transaction.  (Doc. #63-1 at p. 10).  Biel heard the location over
the radio from Covington dispatch and heard that the suspect
vehicle had run a stop sign at the intersection of 12th and Garrard
Streets.  (Id.).  Biel did not witness the reported traffic
violation or any other traffic violation by Plaintiff's vehicle.
(Id. at p. 11-12).  Biel caught up to Plaintiff's car and then
stopped her.  (Id. at p. 12).

Biel was not privy to any of the conversation between Agent
Dye, who requested a marked unit from Covington to stop Plaintiff's
vehicle, and Covington Police dispatch.  (Id. at p. 14).  At the
time of the stop, Biel was not aware of the covert surveillance
that was being conducted by the DEA.  (Id.).  However, at some

point during the traffic stop, Biel did speak to the DEA agents who had been following Plaintiff. (Id. at p. 16).

After stopping her car, Biel contends that he asked for and received consent to search Plaintiff. (Doc. #66-4 at p. 4-5). Biel maintains that he had obtained consent to search Plaintiff's vehicle as well. (Doc. #63-1 at p. 20, Doc. #66-4 at p. 4-5). With respect to the order of the searches performed, Biel's recollection is that the canine unit arrived and was used to search the interior of Plaintiff's vehicle prior to Biel's own hand search of the vehicle. (Doc. #62-4 at p. 81).

At no time during the traffic stop did Biel have cause to fear for his safety. (Doc. #63-1 at p. 20-21). Likewise, at no time did Biel observe anything on Plaintiff's person that he thought might have been a weapon. (Id. at p. 21).


### *OFFICER BRYAN BOGARD*

Officer Bogard was on duty on December 6, 2007. He was in the middle of conducting a traffic stop somewhere in Covington when he heard on the radio that Officer Biel was about to conduct a separate traffic stop on Isabella Street in Newport. (Doc. #62-5, p. 22-23). Bogard was already in close proximity to Officer Biel's traffic stop and so he decided to go to Biel's location in order to provide backup. (Id. at p. 23). At the time he heard of Biel's traffic stop on the radio, Bogard was not aware that it was at the

request of DEA agents who had been following Plaintiff. (Id. at p. 24). Bogard recalls observing Biel perform a quick pat-down of Plaintiff. (Id. at p. 31). The record is unclear whether Bogard admits that he had conducted a second pat-down of Plaintiff.

### *CAPTAIN AMANDA DONELAN*

According to Donelan, she first became aware of Plaintiff's desire to lodge a complaint against the Covington Police when the patrol bureau captain informed her that she needed to call the Plaintiff. Donelan called Plaintiff and tried to ascertain the reason for her dissatisfaction. According to Donelan, Plaintiff was angry and the initial call was not very productive. (Doc. #82 at p. 9). Donelan gathered more information regarding the incident and called Plaintiff a second time to discuss it. (Id.).

During that second phone call, Donelan explained that the reason Plaintiff was stopped by Covington Police was that it was at the request of another law enforcement agency and that it was done in good faith. (Id. at p. 15). Donelan was reluctant to give Plaintiff the name of, or contact information for, the other law enforcement agency (the DEA) because she did not want to compromise any investigation that might have been ongoing at that time. (Id.).

Instead, Donelan offered to take Plaintiff's name and number

and pass it along to that other law enforcement agency and ask them to contact Plaintiff with respect to her complaint. (Id.). Donelan maintains that Plaintiff continually interrupted her during the call. (Id.). Donelan agreed to meet with Plaintiff in-person regarding her complaint. (Id.). Donelan maintains that she was polite and courteous to Plaintiff during both of these phone calls. (Id. at p. 32-33).

As Donelan was the second shift patrol supervisor for Covington Police at the time of Plaintiff's vehicle stop, she was listening in on the police radio to the events as they occurred. Donelan states that she heard over the radio that DEA had witnessed the Plaintiff commit a traffic violation. (Id. at p. 16). When Donelan was gathering information on the stop in order to address Plaintiff's complaint, she spoke with Officer Biel. (Id. at p. 17). Donelan states that Biel relayed to her that he had obtained Plaintiff's consent prior to patting her down. (Id. at p. 17 -18).

When Donelan met with Plaintiff face-to-face, it was at the Covington Police Department. Donelan's meeting with Plaintiff was not much of an improvement over her earlier phone conversations. Donelan maintains that Plaintiff spent a lot of time yelling, repeatedly accusing her of lying and of being racist. (Id. at p. 20, 25, 35). Donelan realized that this in-person conversation was not going to resolve anything and again

offered to pass Plaintiff's information on to the other law
enforcement agency.  Donelan then guided Plaintiff out of the
police station and warned her not to contact the Covington Police
again about this incident or else she would be charged with
harassment.  (Id. at p. 20-21).  The basis of Donelan's threat
was that any repeated complaint by the Plaintiff would have been
without a legitimate purpose as the Covington Police were merely
aiding another police agency and Plaintiff's complaint was more
properly directed at that other agency.  (Id. at p. 21).  Donelan
was again polite and courteous during her meeting with the
Plaintiff.  (Id. at p. 31-32).  Donelan did invite Plaintiff to
contact the Covington Police if she needed assistance with any
other matter.  (Id. at p. 31).


## *ANALYSIS*

### I.  *Summary Judgment*

Summary judgment is warranted where "the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed.R.Civ.P.
56(c).  "In considering a motion for summary judgment, [the court]
view[s] the factual evidence and draw[s] all reasonable inferences
in favor of the non-moving party."  *Dominguez v. Correctional
Med. Services*, 555 F.3d 543, 549 (6th Cir. 2009) (citation

omitted). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. (internal quotations and citation omitted).

## II. *Fourth Amendment and Fourteenth Amendment Claims under 42 U.S.C. § 1983*

Plaintiff's claims are against several police officers in their individual capacities. As such, the defense of qualified immunity must be examined as "a public official sued in his or her individual capacity may still be shielded from suit under the doctrine. . . ." *See Jerauld ex rel. Robinson v. Carl*, No. 06-05, 2009 WL 749781, at *6 (E.D. Ky. Mar. 19, 2009), *Pearson v. Callahan*, 129 S. Ct. 808 (2009), *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), *and Groh v. Ramirez*, 540 U.S. 551 (2004).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 129 S. Ct. at 815 (quoting *Harlow*, 457 U.S. at 818). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (quoting *Groh*, 540 U.S. at 567) (Kennedy, J., dissenting).

The defense of qualified immunity requires a "two-part, sequential analysis." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). First is whether plaintiff has alleged facts which, when taken in a light most favorable to her, show that the defendants' conduct violated a constitutionally protected right. If so, the next step is to determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right. Id. (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).

Happily, the Supreme Court in *Pearson* granted trial courts the discretion to analyze the second step of qualified immunity under *Comstock* without having to decide whether the first criteria has been met. As such, the court will apply that approach here.

Furthermore, as Plaintiff's complaint alleges violations of several different federal laws by multiple Defendants, the court's analysis will be set forth per each individual Defendant.

## A. *Agent Stevens*

Before Agent Stevens' conduct can be analyzed, there is the matter of Plaintiff's motion for reconsideration (Doc. #77) of this court's earlier Opinion and Order (Doc. #76). Said prior Opinion and Order denied Plaintiff's motion to amend her complaint to add Kenneth Stevens (Doc. #54) as a defendant to this action.

For the reasons stated below, Plaintiff's motion for reconsideration is denied.

Shortly after this court's decision on Plaintiff's earlier motion to amend her complaint, the U.S. Supreme Court issued a ruling in *Krupski v. Costa Crociere*, 130 S. Ct. 2485 (2010). The holding in *Krupski* states that "relation back under Rule 15(c)(1)(c) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Id.* at 2489.

Plaintiff argues that this court's earlier analysis regarding what Plaintiff knew about Stevens and when Plaintiff knew it is no longer viable under *Krupski*.

Without reiterating this court's earlier analysis, the court now finds that the outcome of Plaintiff's motion to amend her complaint to add Stevens as a defendant remains the same despite *Krupski*.

According to his affidavit, Stevens did not become aware of a lawsuit having been filed regarding the events surrounding the stop and search of Plaintiff until sometime in November of 2009. (Doc. #79-1, ¶ 9). Plaintiff maintains that Stevens was put on notice of the litigation by virtue of a phone call made by Plaintiff's counsel to Stevens on or about March 10, 2008. (Doc. #58-1, ¶ 10-19). Stevens remembers that phone call but places it earlier in time, closer to the date of the stop and search of the Plaintiff.

(Doc. #79-1, ¶ 6). In any event, the record is clear that any communication between Plaintiff's counsel and Agent Stevens regarding the events of December 6, 2007 occurred months *before* the instant action was filed in this court on September 11, 2008. (Doc. #1).

Under Fed.R.Civ.P. 15(c)(1)(c), an amendment relates back when:

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, *within the period provided by Rule 4(m) for serving the summons and complaint*, the party to be brought in by amendment
>
> (I) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity. (Emphasis added).

The Rule 4(m) period of time is 120 days. In order to successfully amend her complaint to add Stevens and relate it back to the original complaint, Plaintiff must demonstrate that Stevens had notice of the pending litigation no later than January 9, 2009. Plaintiff cannot make such a showing.

While *Krupski* has shifted the analysis back to what the prospective defendant knew or should have known, it did not change the requirement that any such notice on the part of the prospective defendant occur within the Rule 4(m) period - 120 days. "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew

or should have known at the time of filing her original complaint."
*Krupski*, 130 S. Ct. at 2493.

Plaintiff's argument that the phone conversation between her counsel and Agent Stevens constitutes notice under the Rule 4(m) period is wholly unpersuasive. There is no evidence on the record that such conversation occurred at any time other than *prior to* the filing of the complaint. It is self-evident from the plain language of both Rule 15(c)(1)(c) and Rule 4(m) that the 120-day period begins on the date on which an action commences. It is clear that notice of an action cannot occur prior to its filing with the court. Since the period for discovery has closed, adding Stevens as a defendant at this late stage in the proceedings would be unduly prejudicial to him.

Furthermore, adding Stevens is not a change of the party or the naming of a party as required by Rule 15(C). Dye, for whom the substitution is claimed, was dismissed *with prejudice*, prior to the court's ruling on Plaintiff's motion to file a second amended complaint (Doc. #54). Despite their oral argument, a review of the record indicates that Plaintiff's original intent was to add a new party by substituting Stevens for John Does 1-10, while simultaneously dismissing Dye from the action. (Id.).

As the court denies Plaintiff's motion for reconsideration on the question of adding Agent Stevens as a defendant to the litigation, his conduct will not be scrutinized herein.

**B.    *Agent Dye***

By agreed order, on March 31, 2010, Defendant Agent Dye was dismissed from the instant litigation *with prejudice*. (Doc. #59). Thus, his conduct will not be analyzed by the court.

**C.    *Officer Biel***

Reviewing all the facts available to this Defendant at the time of the conduct in question, Officer Biel's stop of Plaintiff's vehicle was constitutionally sound.

Stopping a car and detaining its occupants constitutes a seizure under the Fourth and Fourteenth Amendments even though the purpose of the stop is limited and the time of detention is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The protections afforded under the Fourth Amendment are binding on the states by its incorporation into the Fourteenth Amendment. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

At the time of the stop, Officer Beil had information that the vehicle may have been involved in an illegal drug transaction. (Doc. #63-1 at p. 10). "Police may stop an individual for investigation if they have a 'reasonable suspicion' that the individual has committed a crime." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 2004) (*citing United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). Furthermore, that reasonable suspicion can be based on dispatcher

information.  *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (*citing United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998)).

Quantitatively, reasonable suspicion is less than a preponderance of the evidence.  *Houston*, 174 F.3d at 813. "Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause." *Id.* (citation omitted).

Officer Beil clearly had a reasonable suspicion, obtained via collective knowledge from police dispatch, that Plaintiff's car was involved in some kind of criminal activity.  That is all that is required for police to lawfully stop a vehicle on the street.

Plaintiff argues that if a police bulletin, or in this case a police dispatch radio call, is "issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment."  *Smoak*, 460 F.3d at 780 (*citing United States v. Hensley*, 469 U.S. 221, 232 (1985)).  In banking on this language from *Smoak*, Plaintiff fails to recognize that "[i]n such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit."  *Hensley*, 469 U.S. at 232.

The court finds that there was no constitutional violation in the stop of Plaintiff's car or in the momentary seizure of her person as Officer Beil had at least a reasonable suspicion that a crime had been committed by Plaintiff.

Next is the matter of the pat-down of the Plaintiff.  It is

undisputed that a pat-down of Plaintiff was conducted by Biel. Officer Biel maintains he obtained Plaintiff's consent. (Doc. #66-4 at p. 4-5). Plaintiff's testimony is somewhat contradictory and does not support a factual finding of explicit consent. (Doc. #84 at p. 32). Therefore, there is an issue of fact regarding consent to search.

It is clear from the record, however, that at no time during the traffic stop did Biel have cause to fear for his safety or to believe that Plaintiff was armed with a weapon. (Doc. #63-1 at p. 20-21).

The seminal rule for the permissible pat-down of an individual by the police comes from *Terry v. Ohio*, which states that:

> where a police officer observes unusual conduct which leads him reasonably to conclude . . . that the persons with whom he is dealing *may be armed and presently dangerous* . . . he is entitled for the protection of himself . . . to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30. (Emphasis added). *Accord Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (stating that a reasonable belief that a suspect is armed and presently dangerous is a necessary predicate to a pat-down of a person for weapons), *and United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007) (stating that police may conduct a pat-down if the officer reasonably believes or suspects that the defendant is armed).

There is no equivocation among the precedents on the purpose

of a pat-down.  Case law is very clear that "*Terry* . . . forbids searching for anything other than weapons."  *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993) *(citing Ybarra*, 444 U.S. at 92-94).

Therefore, the court holds that the law regarding the pat-down of a suspect is so clearly established that Officer Biel was on notice such that, if a jury were to believe that he had not obtained Plaintiff's consent, Officer Biel would not be entitled to the defense of qualified immunity for the pat-down of the Plaintiff.

Next is the matter of the search of Plaintiff's car. Generally, a search performed without a warrant issued upon probable cause is per se unreasonable. *Schneckcloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  An exception to this general rule is when the owner of the vehicle consents to a search. *Schneckcloth*, 412 U.S. at 218.  However, for consent to be valid, it must be voluntary. *Id.* at 248.  "Voluntariness is a question of fact to be determined from all the circumstances. . . ." *Id.*

Officer Beil maintains that Plaintiff gave consent to search. (Doc. #63-1 at p. 20, Doc. #66-4 at p. 4-5).  To the contrary, Plaintiff maintains that she was not responsive to Officer Beil's request for consent to search.  (Doc. #84 at p. 144).  By the time Officer Beil searched Plaintiff's vehicle, she had already removed her jacket and had it searched, had been removed from the car and

was patted down, and had her boots taken off and searched. (Doc. #84 at p. 33-36). Plaintiff indicated that she "didn't think she had a choice" regarding the search of her vehicle. (Id. at p. 37).

After considering the totality of the circumstances, the voluntariness of any purported consent obtained by Officer Beil presents an issue of fact. *Schneckcloth*, 412 U.S. at 248-249. Plaintiff's consent has not been "clearly and convincingly" demonstrated by Officer Biel. *Anderson v Liberty Lobby*, 477 U.S. 242, 257 (1986). This issue of fact prevents a judgment of qualified immunity. *Groh*, 540 U.S. at 563-564. Therefore, Defendant Biel's motion for summary judgment with respect to his search of Plaintiff's car is not well-taken.

As it was with the pat-down of Plaintiff, the law regarding the search of vehicles is clearly established such that Officer Biel was on notice and, if a jury were to believe that he had not obtained Plaintiff's consent to search her car, Biel would not be entitled to the defense of qualified immunity.

### D.   *Officer Bogard*

Drawing all reasonable inferences in favor of the non-moving party, the court finds that Officer Bogard conducted a second pat-down of Plaintiff. The record is devoid of whether Officer Bogard had reason to believe that Plaintiff was armed and dangerous at the time of his contact with her. *See Garcia*, 496 F.3d at 505, *and*

*Strahan*, 984 F.3d at 158.  When he began heading to the scene to back up Officer Biel, Bogard was not aware of the DEA's involvement in the stop of Plaintiff.  (Doc. #62-5 at p. 24).  Bogard was aware, however, that Plaintiff had been patted down at least once by Officer Biel.  (Id. at p. 31).

Therefore, the court finds that the law regarding the pat-down of a suspect is clearly established.  Thus, Officer Bogard was on notice that if he did not reasonably believe that Plaintiff was armed, or if he had not obtained consent to search, Officer Bogard would not be entitled to the defense of qualified immunity for the pat-down.  Thus, Officer Bogard's motion for summary judgment is not well-taken.

### E.    Lieutenant Conrad

Before examining Lieutenant Conrad's conduct during the stop and search of Plaintiff, the court must first take up Plaintiff's motion to strike Conrad's motion for summary judgment (Doc. #67), as well as Conrad's motion for additional time to file (Doc. #68).

Conrad's motion for summary judgment (Doc. #66), filed on May 19, 2010, was clearly beyond the last deadline of April 16, 2010 that was set by this court.  (Doc. #60, #64).  However, the "spirit and inclination" of the Federal Rules of Civil Procedure is to favor decisions on the merits and not on the basis of mere technicalities.  *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986).

*Accord Foman v. Davis*, 371 U.S. 178 (1962). Motions to strike are generally disfavored. *Imperial Constr. Mgmt. Corp. v. Laborer's Int'l Union*, 818 F. Supp. 1179, 1186 (7th Cir. 1993). *See also*, 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.37 (3d ed. 2010).

After as many as four unopposed extensions of time to file dispositive motions in this case were granted (Docs. #38, #46, #52, and #64), Plaintiff will not be heard to complain that Conrad's motion is untimely.

Plaintiff's motion to strike Defendant Conrad's motion for summary judgment (Doc. #67) will be denied. Conversely, Conrad's motion for extension of time (Doc. #68) will be granted. Therefore, the court will continue to take Conrad's motion for summary judgment (Doc. #66) under submission.[4]

**F.    *Captain Donelan***

Captain Donelan's involvement in this case was limited to her phone calls and in-person conversation with Plaintiff. According to Donelan, her first and second phone conversations with Plaintiff were unproductive due to Plaintiff continually interrupting her. (Doc. #82 at p. 9, 15). Donelan invited Plaintiff to the Covington Police Department so that they could discuss the Plaintiff's complaint in-person.

---

[4] At oral argument, the court granted Plaintiff additional time to respond to Conrad's motion for summary judgment. To date, Plaintiff's response has yet to be filed.

Donelan asserts that, during this meeting, Plaintiff was unruly, yelled at her and called her a liar and a racist. (Id. at p. 20, 25, 35). Plaintiff categorically denies any such uncivil behavior. (Doc. #84 at p. 196, 204-207).

There is, however, no dispute that Donelan threatened Plaintiff with arrest for harassment if she returned to the Covington Police Department to complain about the stop and search that occurred on December 6, 2007. (Doc. #82 at p. 20-21, Doc. #84 at p. 45, 200). Plaintiff now alleges a violation of her First Amendment rights as a result of Donelan's threat of arrest. A § 1983 claim alleging the violation of First Amendment rights is permissible. *See Helms v. Zubaty*, 495 F.3d 252 (6th Cir. 2007), *Dean v. Byerley*, 354 F.3d 540 (6th Cir. 2004), *and United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d. 738 (6th Cir. 2004).

Assuming that Plaintiff's complaints were a form of protected speech, it does not necessarily follow that Donelan's threat of arrest was a constitutional violation. "[P]rotected speech is not 'equally permissible in all places and at all times.'" *Helms*, 495 F.3d at 255 (*citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985)).

"The government is not required to grant access to all who wish to exercise their right to free speech on every type of government property 'without regard to the nature of the property

or to the disruption that might be caused by the speaker's activities.'" *United Food & Commercial Workers Local 1099*, 364 F.3d at 746 (*citing Cornelius*, 473 U.S. at 799-800 (1985)). The character of the property (traditional public forum, designated public forum or nonpublic forum) is an integral part of the determination of what, if any, governmental limitations may be properly imposed on the speech in question. *United Food & Commercial Workers Local 1099*, 364 F.3d at 746.

Once again, relying on *Comstock* and *Pearson*, the court will not delve into the question of whether or not Donelan's conduct violated Plaintiff's First Amendment rights. Instead, the court finds that First Amendment precedent is complex enough such that Donelan would not have had notice that her conduct, i.e. telling Plaintiff not contact the Covington Police Department again regarding the stop on search on December 6, 2007 lest she be arrested, was potentially a violation of an established right. As such, Donelan is entitled to a judgment of qualified immunity.


**III. Other Pending Motions**

As a final matter, there is Plaintiff's motion to strike the reply memorandum of Defendants, Biel, Bogard and Donelan. (Doc. #74).

Plaintiff complains that these Defendants have belatedly raised the issue of probable cause for the first time in their

reply brief in support of their motion for summary judgment. (Doc. #73). Plaintiff now moves to strike the part of Defendants' reply brief that discusses probable cause.

As previously mentioned, motions to strike are generally disfavored. *Imperial Constr. Mgmt. Corp.*, 818 F. Supp. at 1186. Furthermore, the general rule is that motions to strike apply to pleadings only and not to motions, briefs or memoranda. 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.37[2].

Assuming that Plaintiff's assertion that the Defendants' use of "probable cause" for the first time in their reply brief is true, there is no harm or prejudice unless the court uses the Defendants' argument in ruling on the motion without giving Plaintiff an opportunity to respond. "When new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated, a problem arises with respect to Federal Rule of Civil Procedure 56(c)." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003).

The simple remedy of allowing Plaintiff additional time and granting leave to file a sur-reply is preferable and more pragmatic than the extreme remedy of striking part of a written brief. Therefore, Plaintiff's motion to strike part of the reply brief of Defendants, Biel, Bogard and Donelan, is not well-taken and will be denied. Instead, Plaintiff's alternative motion for leave to file a sur-reply will be granted.

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) Defendant Biel's motion for summary judgment (Doc. #62) be, and it hereby is, **GRANTED,** with respect to his stop of Plaintiff's vehicle and his seizure of her person**,** and **DENIED**, with respect to the pat-down and search of the interior of Plaintiff's vehicle;

(2) Defendant Bogard's motion for summary judgment (Doc. #62) be, and it hereby is, **DENIED**, with respect to his pat-down of Plaintiff;

(3) Defendant Donelan's motion for summary judgment (Doc. #62) be, and it hereby is, **GRANTED**, with respect to the First Amendment claim against her;

(4) Plaintiff's motion to strike Defendant Conrad's motion for summary judgment (Doc. #67) be, and it hereby is, **DENIED**;

(5) Defendant Conrad's motion for additional time to file her motion for summary judgment (Doc. #68) be, and it hereby is, **GRANTED**;

(6) Defendant Conrad's motion for summary judgment (Doc. #66) be, and it hereby is, continued **UNDER SUBMISSION**;

(7) Plaintiff shall file her response to Defendant Conrad's motion for summary judgment within **ten (10) days of the entry of this Order**;

(8) Plaintiff's motion to strike (Doc. #74) the reply memorandum of Defendants, Biel, Bogard and Donelan (Doc. #73) be, and it hereby is, **DENIED**; and Plaintiff's alternative motion for leave to file a sur-reply (Doc. #74) be, and it hereby is, **DENIED as moot**; and

(9) Plaintiff's motion for reconsideration of this court's Opinion and Order (Doc. #77) be, and it hereby is, **DENIED**.

This 2nd day of September, 2010.



Signed By:

_William O. Bertelsman_ WOB

**United States District Judge**

TIC: 46 min.